IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| DONALD F. CHAMBERS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 11-CV-464-PJC |
| ) | |
| MICHAEL J. ASTRUE, Commissioner of the ) | |
| Social Security Administration, ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

Claimant, Donald F. Chambers ("Chambers"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his application for disability insurance benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Chambers appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Chambers was not disabled. For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

## Claimant's Background

At the hearing before the ALJ held in Tulsa, Oklahoma, on November 13, 2008, Chambers testified that he last worked for Wal-Mart in approximately November 2006 for three weeks. (R. 17-51(R. 22, 26). He said that he became stressed and tired doing that job. (R. 22-23). The longest job he had ever had was making pizzas for a family pizza restaurant for eight years. (R. 23).

Chambers testified that he had obsessive-compulsive disorder ("OCD"), and the disorder caused him to be "tired" due to symptoms such as compulsively counting random items. (R. 28-29). He testified that his medication did not stop him from this compulsive behavior, but the mental health professionals tried to control his OCD so that he could "halfway live with it." *Id.* The OCD affected his ability to concentrate on work tasks, because he would lose track of what he was doing. (R. 29). He was also a germaphobe, and he washed his hands often. *Id.*

Chambers testified that he was reluctant to go to the grocery store, and he wanted to leave after five minutes. (R. 31). If he had a list, it confused and frustrated him. *Id.*

Chambers testified that, after his wife had told him that she wanted a divorce, he had attempted to commit suicide by taking Xanax and sitting in a closed garage with a running car. (R. 24, 31-32). He said that he had wanted to end his life since he was 14 years old. (R. 35).

Chambers testified that his depression made him feel awful, and he could not enjoy doing anything, even things that he loved such as driving his motorcycle. (R. 32-33). He said that he also suffered from four or five panic attacks every day. (R. 33-35). His heart raced, his body tensed, and he wanted to run away. (R. 35). He had experienced panic attacks most of his life. *Id.* He felt enclosed in his backyard with a privacy fence to the point that he could not go into the backyard. (R. 34).

Chambers' mother testified that he had lived with her and her husband since September 2006. (R. 37). She said that Chambers got up about noon, watched television, listened to music, and played games on the computer. *Id.* He tried once to mow the lawn and couldn't do it. *Id.* She said that his back, knees, and hips hurt him. (R. 38). She said that he didn't get up until noon because his sleep was disturbed with wakefulness and interrupted sleep. *Id.* She described him as being very rigid about counting random items and wanting things to be in the "correct" order and place. (R. 38-39). He got very upset if things weren't the way he wanted them. *Id.*

Chambers' mother described his anxiety and his difficulty being around people. (R. 39). She gave one example of taking his father to a doctor's office, and Chambers was not able to wait in the waiting room. *Id.* She felt that he was having a panic attack there. (R. 41). A second example was his inability to stay for family gatherings such as Christmas or Thanksgiving after the meal was eaten. (R. 39). She said that Chambers expressed a wish to be dead on most days. (R. 40). She also described his inability to be in the backyard as a panic attack, and she said that the only place Chambers seemed comfortable was in his bedroom. (R. 41).

Chambers' mother testified that, when he was working at the family pizza restaurant, Chambers had anger issues, putting a hole in a wall once and throwing pizza pans. (R. 40). He had a need to compulsively wash his hands all the time. *Id.*

An Initial Evaluation was completed at the University of Oklahoma College of Medicine - Tulsa Psychiatric Clinic (the "OU Clinic") on November 30, 2001 when Chambers was 33 years old. (R. 229-30). The evaluation states that Chambers sought treatment for depression, saying that he had felt depressed for as long as he could remember. (R. 229). He reported insomnia of one-half hour that was relieved by Restoril that he had begun taking two months earlier. *Id.* He frequently felt tense and nervous, but he could relax in the evenings. *Id.* He

worried excessively, but believed he could control it, and he denied irritability, mania, psychosis, or panic disorder. *Id.* Chambers had quit smoking marijuana approximately two months earlier, after a long habit. *Id.* Chambers reported no problems functioning at his job working in deliveries at a nursery. *Id.* On Axis I[1] Chambers was diagnosed with dysthymia and marijuana abuse/dependence currently in remission. (R. 230). On Axis II, he was diagnosed with dependent personality traits, and his current Global Assessment of Functioning ("GAF")[2] was scored as 71-80. *Id.*

On December 21, 2001, Chambers returned to the OU Clinic, and his wife brought up his OCD symptoms. (R. 228). The clinic stated his Axis I diagnoses as dysthymia and OCD, with a diagnosis on Axis II deferred, and his GAF was 71-80. *Id.* His medications were adjusted, and the clinician discussed behavior treatment for his OCD symptoms. *Id.* On January 18, 2002, Chambers reported more symptoms of sadness. (R. 227). The clinician continued the same diagnoses and adjusted his medications. *Id.*

Chambers was seen again at the OU Clinic on July 11, 2002, and he reported improved symptoms. (R. 225-26). His diagnoses were stated as dysthymia, OCD, and dependent

---

[1] The multiaxial system "facilitates comprehensive and systematic evaluation." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000) (hereinafter "DSM IV").

[2] The GAF score represents Axis V of a Multiaxial Assessment system. *See* DSM IV at 32-36. A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id*. at 32. The GAF scale is from 1-100. A GAF score between 21-30 represents "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas." *Id*. at 34. A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id*. A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." *Id*.

4

personality traits, with a GAF of 71, and his medications were adjusted. (R. 226). Chambers returned in September, at which time his GAF was stated as 75, and his medications were continued. (R. 223-24). At an appointment on February 25, 2003, Chambers described his symptoms as well controlled. (R. 221-22). His GAF was rated as 80. (R. 221). At return visits on May 6, September 12, and October 10, 2003, his GAF was stated as 78. (R. 215-20).

On February 2, 2004, at the OU Clinic, Chambers described himself as "doing pretty good," and his GAF was reported as 80. (R. 213-14). On August 10, 2004, he said he was doing great, and his GAF was again reported as 80. (R. 212). Chambers was still doing well on October 11, 2004, with a GAF of 80, and on December 10, 2004, his GAF was rated as 85. (R. 208-11).

On February 8, 2005, at the OU Clinic, Chambers complained that he was "always thinking" and could not shut down his mind. (R. 206-07). His diagnoses on Axis I were OCD in remission, dysthymia, and nicotine dependence, with a note to rule out seasonal affective disorder. (R. 207). A diagnosis on Axis II was deferred, and his GAF was stated as 80. *Id.* These diagnoses stayed the same on May 3, 2005. (R. 204-05). On September 19, 2005, Chambers said that he had experienced some suicidal thoughts three weeks before the appointment, but he did not think he would commit suicide. (R. 202-03). Chambers also said that he was doing his obsessive behavior of counting at least one hour a day. (R. 203). His Axis I diagnoses were stated as OCD, major depressive disorder, and nicotine dependence, and his GAF was stated as 68.

On August 31, 2006, Chambers was admitted to Wagoner Community Hospital after he took Xanax and Trazadone, and then attempted to asphyxiate himself in the car. (R. 233). According to the admission report, Chambers had lost his job one month earlier, and "everything

5

was fine" until his wife had told him she wanted a divorce. *Id.* On discharge on September 11, 2006, Chambers' Axis I diagnosis was depressive disorder, not otherwise specified, acute, with suicide attempt. (R. 232). His GAF was stated as 45. *Id.*

Chambers followed up with Associated Centers for Therapy ("ACT"), and a comprehensive treatment plan was established in September 2006. (R. 257-69). Axis I diagnoses were major depression, recurrent, OCD, and panic disorder without agoraphobia. (R. 264). Chambers' GAF was stated as 55. *Id.*

Chambers saw Stanley Hanan, M.D. at ACT on September 19, 2006, and Dr. Hanan described conflicts in how Chambers described his marriage and his wife after she asked for a divorce. (R. 272). He said that Chambers displayed "significant arrogance and narcissism," and failed to perceive the inconsistencies in his description of his history. *Id.* Dr. Hanan diagnosed Chambers with mood disorder not otherwise specified and probable personality disorder. *Id.* On October 17, 2006, Dr. Hanan said that insight was "still problematic," and his diagnosis was major depressive disorder. (R. 271). On November 20, 2006, Chambers complained of continued depression, irritability, and sleep disturbance. (R. 270). He said that he had worked at Wal-Mart for about three weeks, but had to quit due to "intense stress." *Id.* Dr. Hanan diagnosed Chambers with major depressive disorder and personality disorder not otherwise specified with a note to rule out malingering. *Id.*

Chambers presented to Dr. Hanan on January 2, 2007 with concern that he was not feeling better. (R. 330). Dr. Hanan's diagnoses continued as major depressive disorder and personality disorder not otherwise specified. *Id.* On January 24, 2007, Chambers felt better and believed that his medications were helping. (R. 329). On March 21, 2007, Chambers' only complaint was persistent sleep disturbance due to racing thoughts, and Dr. Hanan adjusted his

6

medications. (R. 328). Dr. Hanan's diagnosis was major depressive disorder with continued clinical improvement. *Id.* Diagnoses on April 18, 2007 were major depressive disorder and personality disorder, not otherwise specified. (R. 327).

In a new treatment plan in April 2007, Chambers' diagnosis on Axis I was stated as major depressive disorder, recurrent, with a diagnosis on Axis II of personality disorder not otherwise specified. (R. 313-27). His GAF was stated as 56. (R. 319). On May 16, 2007, Chambers admitted that he was getting better. (R. 359). He had joined a caving group that took outings on weekends, and he was looking forward to the next outing. *Id.* Dr. Hanan stated Chambers' diagnosis as major depressive disorder and continued his medications unchanged. *Id.*

On September 11, 2007, Chambers said that he remained depressed and anxious. (R. 398). Dr. Hanan diagnosed major depression and increased clonazepam, but left other medications unchanged. *Id.* On October 23, 2007, Chambers was doing better, and his diagnosis and medications continued unchanged. (R. 399).

On January 29, 2008, Dr. Hanan said that Chambers was "doing ok" with his target symptoms satisfactorily controlled. (R. 405). Chambers reported that he had gotten through the Christmas holiday "with minimal stress." *Id.* Dr. Hanan continued to diagnose major depression, but added possible personality disorder, and he continued Chambers' medications unchanged. *Id.* On March 11, 2008, Chambers said that he was doing well, and Dr. Hanan continued his medications unchanged. (R. 404). On April 22, 2008, Chambers was "doing fairly well," his symptoms were under good control, and there were no complaints. (R. 403). Medications were continued unchanged. *Id.* On June 3, 2008, he was doing well, and there were no new complaints. (R. 402). On July 29, 2008, Dr. Hanan stated that Chambers was "down in the dumps for reasons that are unclear." (R. 401). He added a trial of Lexapro. *Id.*

7

On January 7, 2009, Chambers told Dr. Hanan that he had no purpose and he hated being alive. (R. 418). Dr. Hanan continued the diagnosis of major depressive disorder, and he adjusted Chambers' medications. *Id.* On February 18, 2009, Chambers was accompanied by his mother. (R. 417). He was doing "fair," which Dr. Hanan noted was considerably better than his January appointment, and Dr. Hanan continued his medications. *Id.* On April 1, 2009, Chambers rated his mood as slightly worse than in February, and Dr. Hanan adjusted his medications. (R. 416). On May 13, 2009, Chambers said that he was about the same, and Dr. Hanan continued his "basic medication regimen" with some adjustments. (R. 415). Chambers' medications were adjusted again on June 24, 2009, when he reported no response to the previous change. (R. 414). On August 5, 2009, Chambers was having moderate depressive symptoms, but said he was improved on new medications and asked for an increase in dosage. (R. 413). He also discussed uncontrolled weight gain with Dr. Hanan. *Id.* On September 16, 2009, Chambers' target symptoms were controlled, but he said that he had a lack of energy and lack of motivation. (R. 412). Dr. Hanan recommended a reduced dosage of clonazepam, and Chambers agreed to try that. *Id.* On December 2, 2009, Chambers was in a moderately severe depression, but Dr. Hanan commented that his complaints had "always been somewhat enigmatic, as he never really appears depressed, and his description of some of his activities belies his history of isolation and anhedonia." (R. 411). Chambers advised that he had completely weaned himself from clonazepam, and was not having any "significant recurrence of anxiety symptoms." *Id.* Dr. Hanan increased Chambers' dosage of Paxil. *Id.*

On January 13, 2010, Chambers told Dr. Hanan that his depression was worse, and his medications were adjusted. (R. 410). His medications were continued unchanged on February 10, 2010. (R. 409). On March 24, 2010, Chambers reported that his depression had improved

8

slightly since his February visit, but he had also developed a sensory disturbance with a tingling sensation on the left side of his body. (R. 407). Dr. Hanan added Lamictal as a precaution against seizures and continued Chambers' other medications. *Id.*

Agency consultant Denise LaGrand, Psy. D. completed a mental status examination of Chambers on January 30, 2007.[3] (R. 281-87). Chambers' immediate memory ability was low average, he had no difficulty with recent recall, and his long-term memory was estimated to be adequate. (R. 284). Dr. LaGrand estimated that Chambers' judgment was adequate. *Id.* His IQ was estimated to be in the average range, and his ability to understand, remember, and carry out instructions was considered to be adequate. (R. 285). In summary, Dr. LaGrand stated that Chambers' "ability to perform adequately in most job situations, handle the stress of a work setting and deal with supervisors or co-workers is estimated to be low average." *Id.* Her diagnostic impression on Axis I was major depressive disorder, moderate, and on Axis II was obsessive compulsive traits. She stated Chambers' GAF as 50. *Id.*

Nonexamining agency consultant Burnard Pearce, Ph.D. completed a Psychiatric Review Technique form and a Mental Residual Functional Capacity Assessment form on February 14, 2007. (R. 295-312). On the Psychiatric Review Technique form, Dr. Pearce noted major depressive disorder, moderate for Listing 12.04. (R. 298). For Listing 12.06, he noted an anxiety-related disorder, including obsessive-compulsive traits. (R. 300). For the "Paragraph B Criteria,"[4] Dr. Pearce found that Chambers had mild restriction of his activities of daily living,

---

[3] Agency consultant Seth Nodine, M.D. completed a physical examination and report, but Chambers has not alleged any physical complaints or stated any issues in this Court related to physical complaints, and Dr. Nodine's report is therefore not summarized herein. (R. 288-94).

[4] There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3)

9

moderate difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace, with one or two episodes of decompensation. (R. 305). In the "Consultant's Notes" portion of the form, Dr. Pearce noted Chambers' 2006 suicide attempt and subsequent hospitalization. (R. 307). He noted the precipitating circumstance of Chambers' wife announcing that she wanted a divorce, and he stated that Chambers appeared to be more settled after that time. *Id.* Dr. Pearce noted that Chambers appeared to respond well to treatment and that his treating source had assessed Chambers' anxiety as mild. *Id.*

On the Mental Residual Functional Capacity Assessment form, Dr. Pearce noted moderate limitations in Chambers' ability to understand, remember, and carry out detailed instructions. (R. 309). He also found a moderate limitation in Chambers' ability to interact appropriately with the general public. (R. 310). He found no other significant limitations. (R. 309-10). Dr. Pearce found that Chambers could "understand, remember and carry out simple and some, but not all, detailed instructions under routine supervision." (R. 311). He stated that Chambers could not tolerate "active, ongoing involvement with the general public but [could] relate to the general public, coworkers and supervisors in an incidental manner." *Id.*

**Procedural History**

Chambers filed an application on December 6, 2006, seeking disability insurance benefits under Title II, 42 U.S.C. §§ 401 *et seq.* (R. 94-101). Chambers alleged onset of disability as November 10, 2006. (R. 94). The application was denied initially and on reconsideration. (R. 54-58, 61-63). A hearing before ALJ John Volz was held November 13, 2008. (R. 17-51). By

---

difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") § 12.00C. *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

decision dated March 24, 2009, the ALJ found that Chambers was not disabled from his alleged date of onset of disability through the date of the ALJ's decision. (R. 10-16). On May 27, 2011, the Appeals Council denied review of the ALJ's findings. (R. 1-5). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of this appeal. 20 C.F.R. § 404.981.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[5] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988)

---

[5] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

(detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

### Decision of the Administrative Law Judge

The ALJ found that Chambers met insured status requirements through June 30, 2011. (R. 12). At Step One, the ALJ found that Chambers had not engaged in any substantial gainful activity since his alleged onset date of November 10, 2006. *Id.* At Step Two, the ALJ found that Chambers had severe impairments of thoracic pain, major depressive disorder, and obsessive compulsive disorder. *Id.* At Step Three, the ALJ found that Chambers's impairments did not meet a Listing. *Id.*

The ALJ determined that Chambers had the RFC to perform light work. (R. 13). The ALJ stated that Chambers could "follow simple instructions under routine supervision." *Id.* He found that Chambers needed "to avoid direct contact with the public and he should not be in

close contact with coworkers." *Id.* At Step Four, the ALJ found that Chambers was unable to perform any past relevant work. (R. 15). At Step Five, the ALJ found that there were significant numbers of jobs in the national economy that Chambers could perform, taking into account his age, education, work experience, and RFC. *Id.* Therefore, the ALJ found that Chambers was not disabled from November 10, 2006 through the date of his decision. (R. 16).

## Review

Chambers' first assertion is that the ALJ erred by failing to discuss in detail the records of Chambers' treatment at ACT. It is true that the ALJ did not discuss Dr. Hanan's treatment notes in detail, and he only made fleeting references to ACT. (R. 14-15). However, this Court concurs with the Commissioner that ALJ's decision was in compliance with the applicable legal standards. Nothing in the ACT treatment records suggests functional limitations of Chambers that were substantially more severe than the limitations that the ALJ included in his RFC determination. When evidence does not conflict with the ALJ's RFC determination, the ALJ has a reduced burden to expressly discuss the evidence. *Howard v. Barnhart*, 379 F.3d 945, 947 (10th Cir. 2004).

In *Howard*, the Tenth Circuit rejected the claimant's argument that the ALJ had not complied with his obligation to discuss the evidence, citing to *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). The *Howard* court first found that the ALJ's discussion was adequate, but then, as a second point, found that "perhaps more importantly, in this case none of the record medical evidence conflicts with the ALJ's conclusion that claimant can perform light work. When the ALJ does not need to reject or weigh evidence unfavorably in order to determine a claimant's RFC, the need for express analysis is weakened." *Howard*, 379 F.3d at 947. *Howard* is directly applicable to the present case, because the ALJ did not need to reject or weigh the

13

evidence of Chambers' treatment at ACT in order to determine Chambers' RFC.

Chambers does not point to any particular records of Dr. Hanan's treatment that, had the ALJ given them full credit, that would have altered the ALJ's RFC determination. Instead, Chambers states repeatedly that this Court cannot meaningfully review the ALJ's decision because the ALJ failed to identify the exhibits that he rejected and the reasons for his rejection. Again, the ALJ here does not appear to have rejected any evidence regarding ACT and Chambers' treatment by Dr. Hanan. Instead, the evidence of Chambers' treatment at ACT is consistent with the nonexertional mental limitations that the ALJ included in his RFC determination, and the ALJ therefore had a reduced obligation to expressly consider this consistent evidence.

Chambers makes an abbreviated attempt to argue that the ALJ was required to evaluate medical opinion evidence. Plaintiff's Opening Brief, Dkt. #19, p. 5. The undersigned finds that this is not a sufficiently developed argument to be addressed by the Court. *Wall v. Astrue*, 561 F.3d 1048, 1066 (10th Cir. 2009) ("perfunctory" arguments are waived). However, even if this argument were adequately developed, it would not be persuasive, because Chambers has not cited to any particular record of Dr. Hanan that constitutes opinion evidence. The Tenth Circuit has explained that a "true medical opinion" is one that contains a doctor's "judgment about the nature and severity of [the claimant's] physical limitations, or any information about what activities [the claimant] could still perform." *Cowan v. Astrue*, 552 F.3d 1182, 1188-89 (10th Cir. 2008). Chambers cites to no specific record evidence to show that Dr. Hanan made any statements that would constitute opinion evidence. *Gilbert v. Astrue*, 231 Fed. Appx. 778, 782 (10th Cir. 2007) (unpublished) ("In the absence of essential references to the record in a party's brief, the court will not 'sift through' the record to find support for the claimant's arguments.")

(further quotation and citation omitted).  Chambers' argument relating to the ALJ's failure to discuss his psychological treatment records in detail is not persuasive, and reversal is not required on this point.

Chambers' argument that the ALJ's credibility assessment was insufficient is also not persuasive.  Credibility determinations by the trier of fact are given great deference.  *Hamilton v. Secretary of Health & Human Services,* 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations].  Not only does an ALJ see far more social security cases than do appellate judges, [the ALJ] is uniquely able to observe the demeanor and gauge the physical abilities of the claimant in a direct and unmediated fashion.

*White v. Barnhart,* 287 F.3d 903, 910 (10th Cir. 2001).  In evaluating credibility, an ALJ must give specific reasons that are closely and affirmatively linked to substantial evidence.  *See Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995); Social Security Ruling 96-7p, 1996 WL 374186.

Chambers argues that the ALJ did not discuss the factors in SSR 96-7p and that the ALJ's assessment is therefore not sufficient.  While the ALJ's credibility assessment was minimal, the Court finds it adequate.  *Cobb v. Astrue*, 364 Fed. Appx. 445, 450 (10th Cir. 2010) (unpublished) (while ALJ's credibility assessment was summary, taking the decision as a whole the ALJ's findings regarding the claimant's testimony were "clear enough" without violating rule against *post hoc* justification).  The ALJ's discussion of Chambers' credibility was as follows:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above [RFC] assessment.

> Dr. LaGrand's report showed Mr. Chambers to be no worse than low average in any of his cognitive functions. She opined that his ability to function appropriately socially and emotionally was adequate. [Citation omitted.] His obsessive compulsive traits appear to not extend much beyond washing his hands a little more than the norm. His depression and anxiety were obviously incited by his divorce and circumstances concerning his ex-wife. But he readily became interested in a woman he met at [ACT], suggesting that his depression was situational rather than clinical. There is no reason to doubt that his emotional state will improve even further with continued psychological treatment and compliance with his medications.

(R. 15).

The first paragraph is a boilerplate provision that introduced the credibility assessment. In the second paragraph, the first two sentences noted aspects of Dr. LaGrand's report. The ALJ should then have specifically stated that he found that evidence of Dr. LaGrand to contrast with Chambers' contentions that his mental functions were so impaired that he was disabled. However, the Court finds that, given the context of these two sentences in the ALJ's decision, it is clear that the ALJ included them because he found that they contrasted with Chambers' testimony. These were legitimate reasons that supported the ALJ's adverse credibility assessment. *See* 20 C.F.R. § 404.1529(c)(4) ("we will evaluate your statements in relation to the objective medical evidence").

In addition to the legitimate reason of citing provisions of objective medical evidence that contrasted with Chambers' claims of disabling mental symptoms, the Court concludes that a second legitimate factor used by the ALJ was his finding that Chambers' depression was situational. The Court finds that a fair reading of this portion of the ALJ's analysis was that the severity of Chambers' depression was at its peak when he attempted suicide within days after his wife informed him that she wanted a divorce. This reading is reinforced by the last sentence of his paragraph when the ALJ discussed continued improvement of Chambers' symptoms. In this

16

portion of his discussion, the ALJ should have included specific citations to the record that supported his view, but the Court finds that the wording used by the ALJ suggests that he found that the entire longitudinal record supported the view that Chambers' symptoms had improved significantly since the 2006 hospitalization. *Doyal v. Barnhart*, 331 F.3d 758, 761 (10th Cir. 2003) ("the form of words should not obscure the substance of what the ALJ actually did").

There is no doubt that the entire record supports the ALJ's finding that Chambers' severe depression in 2006 was situational. For example, well after the 2006 hospitalization, Dr. Hanan asked Chambers in 2010 to look back to when he was not on medications and was severely depressed and rate his depression on a scale of 0 to 10, with 0 consistent with suicidal ideation, and Chambers rated his past depression as a "1." (R. 409). In response to Dr. Hanan's question, Chambers rated his depression in 2010 as a "6" or a "7." (R. 407-09). Similarly, Dr. Pearce noted the "precipitating circumstances" of the divorce in relationship to Chambers' suicide attempt in 2006, and Chambers' subsequent improvement upon treatment. (R. 307). Thus, while the ALJ should have given specific examples supporting his reasoning that Chambers' severe depression in 2006 was situational in nature, the record is replete with supporting substantial evidence.

The undersigned is mindful that the Court may not "create or adopt post-hoc rationalizations to support the ALJ's decision that are not apparent from the ALJ's decision itself." *Haga v. Astrue*, 482 F.3d 1205, 1207-08 (10th Cir. 2007). Again, the Court is not supplying reasoning that was not included in the ALJ's credibility assessment, but instead the Court finds that the ALJ's decision makes it apparent that part of his reasoning was that the longitudinal record showed an improvement after Chambers' 2006 hospitalization that contrasted with his claims of disabling mental symptoms. *See Luttrell v. Astrue*, 453 Fed. Appx. 786, 792

n.7 (10th Cir. 2011) (unpublished) (court's recognition of tacit but obvious rejection of evidence did not violate prohibition on *post hoc* rationales). However, even if the Court were obliged, due to the doctrine prohibiting *post hoc* rationales, to reject this reasoning by the ALJ because it was not articulated with enough clarity or specificity, the Court would nevertheless find that the ALJ's credibility assessment was supported by his first examples of the extent to which Dr. LaGrand's report contrasted with Chambers' claims.

Finally, the Court rejects the ALJ's sentence minimizing Chambers' obsessive-compulsive traits by stating that they "appear to not extend much beyond washing his hands a little more than the norm." (R. 15). The ALJ gave no citation to the record to support this characterization, and it is therefore not "closely and affirmatively linked to substantial evidence." *Kepler*, 68 F.3d at 391. This invalid reason is not fatal to the ALJ's credibility assessment when he gave other valid reasons to support his assessment. *See Butler v. Astrue*, 410 Fed. Appx. 137, 139 (10th Cir. 2011) (unpublished) (credibility assessment upheld even though one reason given by ALJ was unclear).

The ALJ's credibility determination was supported by specific reasons linked to substantial evidence, and the undersigned therefore finds that it should be affirmed. *Mann v. Astrue*, 284 Fed. Appx. 567, 571 (10th Cir. 2008) (unpublished) (finding credibility determination adequate when ALJ discussed three points).

**Conclusion**

The decision of the Commissioner is supported by substantial evidence and the correct legal standards were applied. The decision is **AFFIRMED**.

Dated this 28th day of August 2012.

Paul J. Cleary
United States Magistrate Judge